NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11857

COMMONWEALTH  vs.  LAWRENCE MOORE.


Bristol.     October 6, 2015. - January 11, 2016.

Present (Sitting at New Bedford):  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.



Constitutional Law, Parole, Search and seizure, Burden of proof, Reasonable suspicion.  Search and Seizure, Expectation of privacy, Presumptions and burden of proof, Reasonable suspicion.  Practice, Criminal, Parole, Motion to suppress. Controlled Substances.




Indictment found and returned in the Superior Court Department on April 25, 2013.

A pretrial motion to suppress evidence was heard by Thomas F. McGuire, Jr., J.

An application for leave to prosecute an interlocutory appeal was allowed by Botsford, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.  The Supreme Judicial Court granted an application for direct appellate review.


Rachel W. van Deuren, Assistant District Attorney, for the Commonwealth.
Nancy A. Dolberg, Committee for Public Counsel Services, for the defendant.

CORDY, J.  In October, 2011, the New Hampshire parole board issued a certificate of parole to the defendant, Lawrence Moore, who was serving a sentence of from two and one-half to ten years for assault with a firearm.  The defendant's parole was transferred to the Commonwealth in May, 2012.  On November 16, 2012, the defendant's parole officer and others searched the defendant's apartment without a warrant and seized seventeen "twists" of "crack" cocaine in the defendant's bedroom drawer, as well as a digital scale and a gun lock.  The defendant was indicted for possession of cocaine with intent to distribute, in violation of G. L. c. 94C, § 32A (c).[1]  He filed a motion to suppress the evidence seized from his home, arguing that the search was unconstitutional under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.[2]

After a hearing, the motion judge issued a written order allowing the defendant's motion to suppress, holding that, while the search did not violate the Fourth Amendment, it was barred

---

[1] The New Hampshire parole board also issued a warrant for the defendant's arrest.

[2] The defendant sought also to suppress evidence seized from his girl friend, Virginia Sequeira, during a traffic stop made prior to the search of the defendant's apartment.  The motion judge, noting that the Commonwealth agreed that it would not introduce the drugs seized during the traffic stop at trial, limited the motion to suppress to the evidence seized during the warrantless search of the defendant's home.

under art. 14.  The motion judge concluded that art. 14 offers the same protections for parolees as it does for probationers, and, therefore, searches of a parolee's residence must be supported by both reasonable suspicion and either a search warrant or a traditional exception to the search warrant requirement.  See Commonwealth v. LaFrance, 402 Mass. 789, 792-794 (1988).  In granting the motion to suppress, the judge ruled that, while the Commonwealth had reasonable suspicion to search the defendant's apartment for evidence of a drug-related parole violation, the search was unconstitutional because there was neither a search warrant nor the presence of a traditional exception to the warrant requirement.

The Commonwealth was given leave to proceed with an interlocutory appeal to the Appeals Court.  We granted the Commonwealth's application for direct appellate review in order to determine the privacy protections afforded to parolees under art. 14 against warrantless searches and seizures in their homes.

We conclude that art. 14 offers greater protection to parolees than does the Fourth Amendment.  Article 14 does not, however, offer as much protection to parolees as it affords to probationers.  Therefore, where a parole officer has reasonable suspicion to believe that there is evidence in the parolee's home that the parolee has violated, or is about to violate, a

condition of his parole, such suspicion is sufficient to justify a warrantless search of the home. Because we also agree with the motion judge's finding, not contested on appeal by the defendant, that the officer had reasonable suspicion that a search of the defendant's home would produce evidence of a parole violation, we vacate the allowance of the defendant's motion to suppress the evidence.

1. Background. As noted, the defendant was paroled on October 11, 2011, by the New Hampshire parole board. The certificate of parole, with which the defendant agreed to comply, contained several conditions, including that the defendant would "permit the parole officer to visit [the defendant's] residence at any time for the purpose of examination and inspection in the enforcement of the conditions of parole, and submit to searches of [his] person, property, and possessions as requested by the parole officer." The defendant also agreed to "be of good conduct and obey all laws" and to "not illegally use, sell, possess, distribute, or be in the presence of drugs."

On April 6, 2012, the defendant filed an application to transfer his parole supervision to Massachusetts. His application acknowledged an agreement to comply with the terms and conditions of parole set out by both New Hampshire and Massachusetts. In May, 2012, the Massachusetts parole board

issued -- and the defendant signed -- a certificate of parole, which included a condition, among others, stating, "supervise for drugs." Parole Officer Robert Jackson was assigned to supervise the defendant.

In late October or early November, 2012, Jackson received an anonymous tip that the defendant was dealing in illegal drugs in New Bedford. Based on that call, Jackson decided to review records of the defendant's location, obtained through a global positioning system (GPS) device that the defendant was required to wear. The records revealed that the defendant traveled to Boston on November 9, 2012, where he made two stops, for a few minutes each, before returning to New Bedford. During the following two days, the defendant made several short stops in New Bedford. Continuing to monitor the GPS device, Jackson observed the defendant, on November 16, 2012, make a "six, seven minute stop in Boston," before heading back toward New Bedford.

Jackson immediately issued a warrant for detainer purposes for the defendant,[3] and contacted the State police. Shortly thereafter, Trooper Marc Lavoie of the State police and Detective Jason Gangi of the New Bedford police department pulled over the vehicle in which the defendant had been

---

[3] A warrant for detainer purposes, issued by a parole officer, allows for the fifteen-day detainment of a parolee if the parole officer has "reasonable belief that a parolee has . . . violated the conditions of his parole." 120 Code Mass. Regs. § 303.04 (1997).

traveling on his way back to New Bedford.  There was a woman driving the vehicle who turned out to be the defendant's girl friend, Virginia Sequeira.  Lavoie smelled a strong odor of marijuana, and Gangi observed a marijuana cigarette in the defendant's lap.

State police Trooper Marc Cyr arrived at the scene and separated Sequeira and the defendant.  The two gave differing accounts for why they had been in Boston.  The defendant said he had spent an hour at a friend's house.[4]  The police then searched the defendant and the vehicle, finding nothing.  Cyr falsely told Sequeira that the defendant had admitted to possession of cocaine, and Sequeira then produced two bags containing cocaine.[5]

After arresting the defendant and Sequeira, Cyr contacted Jackson and related to him what had occurred.  As a consequence, Jackson and three police officers went to, and conducted a search of, the defendant's apartment.  Jackson found seventeen bags of drugs in the defendant's bedroom, along with a digital scale and gun lock.  Jackson did not have a warrant to search the apartment.

2.  Discussion.  In reviewing a motion to suppress, "we

---

[4] This story was inconsistent with the global positioning system (GPS) data that prompted the warrant for detainer and the motor vehicle stop.

[5] State police Trooper Marc Cyr had been involved in arresting Virginia Sequeira for cocaine possession two years prior to November 16, 2012.

accept the judge's subsidiary findings of fact absent clear error," but "review independently the motion judge's application of constitutional principles to the facts found." Commonwealth v. Franklin, 456 Mass. 818, 820 (2010). Where there has been an evidentiary hearing, "we defer to the credibility findings of the judge, who had the opportunity to observe and evaluate the witnesses as they testified." Commonwealth v. Peters, 453 Mass. 818, 823 (2009).

The Fourth Amendment and art. 14 prohibit "unreasonable" searches and seizures. See Commonwealth v. Rodriguez, 472 Mass. 767, 775-776 (2015). We determine whether a search is reasonable by "balanc[ing] the intrusiveness of the police activities at issue against any legitimate governmental interests that these activities serve." Id. at 776. See Samson v. California, 547 U.S. 843, 848 (2006). "In balancing these factors, we keep in mind that art. 14 may provide greater protection than the Fourth Amendment" (quotation omitted). Rodriguez, supra.

a. Parolee's expectation of privacy. The United States Supreme Court has, in a series of cases, established that, under the Fourth Amendment, probationers and parolees have a significantly diminished expectation of privacy. In Griffin v. United States, 483 U.S. 868, 875-876 (1987), the Court held, under the "special needs" exception to the warrant requirement,

that a warrantless search of a probationer's home, pursuant to a State regulation requiring reasonable grounds and approval of the probationer's supervisor for such a search, did not violate the probationer's privacy rights under the Fourth Amendment. Years later, in United States v. Knights, 534 U.S. 112, 121 (2001), the Court indicated that a warrantless search based on reasonable suspicion that a probationer (who was subject, as a condition of his probation, to warrantless searches) was engaged in criminal activity was not intrusive because of the "probationer's significantly diminished privacy interests." Most recently, the Court found that a parolee's expectation of privacy is diminished even beyond that of a probationer. See Samson, 547 U.S. at 850, 852 (allowing suspicionless and warrantless searches of parolees based purely on status as parolees).

Under art. 14, we have already established that a probationer has a diminished expectation of privacy. See LaFrance, 402 Mass. at 792 ("We accept for art. 14 purposes the principle that a reduced level of suspicion, such as 'reasonable suspicion,' will justify a search of a probationer and her premises"). Not yet having had an opportunity to address the same issue in the context of parolees, we now conclude that art. 14 provides to a parolee an expectation of privacy that is less than even the already diminished expectation afforded to a

probationer.

In evaluating the defendant's expectation of privacy, his status as a parolee is "salient."  Samson, 547 U.S. at 848, quoting Knights, 534 U.S. at 118.  A parolee is, during the balance of his or her sentence, effectively a ward of the Commonwealth.  See 120 Code Mass. Regs. §§ 101.01, 101.03 (1997) (parolees under custody of parole board, which is executive agency).  Like probationers, parolees are on the "continuum of [S]tate-imposed punishments" (quotation omitted).  Samson, 547 U.S. at 850.  However, unlike probationers, the parole system entrusts to the Commonwealth the custody and supervision of parolees, affording them an established alternative to the incarceration to which they were sentenced.  Given that probation is, instead, offered as a judicially imposed sentence in lieu of incarceration, parolees have an expectation of privacy that is diminished beyond that of probationers because "parole is more akin to imprisonment than probation is."  Id.

b.  Government interest in supervising parolees.  While a parolee's expectation of privacy is diminished, the Commonwealth's supervisory "interests, by contrast, are substantial."  Samson, 547 U.S. at 853.  The Commonwealth need not "ignore the reality of recidivism or suppress its interest in 'protecting potential victims of criminal enterprise,'" id. at 849, quoting Knights, 534 U.S. at 121, and "may therefore

justifiably focus on [parolees] in a way that it does not on the ordinary citizen." Knights, supra. See Samson, supra at 854 (Supreme Court has "acknowledged the grave safety concerns that attend recidivism").

The parole system reflects the need for enhanced supervision. See G. L. c. 127, § 130 (parole permits "shall be granted only if the [parole] board is of the opinion . . . that there is a reasonable probability that, if the prisoner is released with appropriate conditions and community supervision, the prisoner will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society"); Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 23 (2015) ("The question the [parole] board must answer for each inmate seeking parole [is] whether he or she is likely to reoffend . . .").

We conclude that the Commonwealth's supervisory interests are more significant than a parolee's diminished expectation of privacy.

c. Constitutional implications. We next consider the constitutional ramifications of these determinations, and we conclude that reasonable suspicion, but not a warrant, was needed to justify a search of a parolee's home.

We note at the outset, as did the motion judge, that the Fourth Amendment offers no solace to parolees such as the

defendant.  Under Samson, parolees do "not have an expectation of privacy that society would recognize as legitimate."  Samson, 547 U.S. at 852.  A search such as the one Jackson conducted was thus reasonable under the Fourth Amendment.  However, we must also consider the privacy implications under art. 14, as "a State is free as a matter of its own law to impose greater restrictions on police activity than those [the Supreme] Court holds to be necessary upon [F]ederal constitutional standards" (emphasis omitted).  Oregon v. Hass, 420 U.S. 714, 719 (1975).  See Rodriguez, 472 Mass. at 776.

Traditionally, we have maintained that art. 14 affords greater protections for probationers than does the Fourth Amendment.  In 1988, one year after the Supreme Court released its decision in Griffin, we decided in LaFrance that art. 14 guarantees that any condition of probation compelling a probationer to submit to searches must be accompanied by reasonable suspicion.  LaFrance, 402 Mass. at 792-793.  We also held that "a warrantless search of a probationer's home, barring the appropriate application of a traditional exception to the warrant requirement, cannot be justified under art. 14."  Id. at 794.  This interpretation remains the standard for probationer searches under art. 14 despite the Supreme Court's subsequent decision in Knights, construing the Fourth Amendment.

We conclude that, in the parole context, although the

privacy protections afforded to parolees under art. 14 are incrementally less than those granted to probationers, individualized suspicion is still the appropriate standard, at least with respect to a search of the parolee's home.  To require more would be "both unrealistic and destructive of the whole object of the continuing [parole] relationship," Griffin, 483 U.S. at 879, while dispensing with individualized suspicion in its entirety would, outside the realm of "special needs" exceptions, establish a precedent we are not inclined to set.[6] However, while we determined in LaFrance that there was no reason "to eliminate the usual requirement imposed by art. 14 that a search warrant be obtained," LaFrance, 402 Mass. at 794, we conclude that, with regard to parolees, imposing a warrant requirement would hinder the Commonwealth in addressing its significant supervisory interests.[7]

---

[6] Our decision to establish a reasonable suspicion requirement under art. 14 of the Massachusetts Declaration of Rights for searches of parolees' homes obligates all such parolee searches to be conducted under an individualized suspicion standard.  The parole board, in creating conditions of release, may not contract around the reasonable suspicion requirement by making the issuance of a prisoner's parole subject to suspicionless searches and seizures of his home. Such authority would inappropriately allow the parole board to compel a parolee, keen to commute his or her sentence, to accept a condition that would unnecessarily and unreasonably limit his or her art. 14 privacy rights.

[7] Despite our decision to eliminate the warrant requirement for searches of parolees' homes, the Commonwealth is still appropriately limited in its ability even to conduct such

d.  <u>Application of principles to the present case</u>.  Having concluded that reasonable suspicion is sufficient to justify the warrantless search of a parolee's home, we consider whether Jackson had such suspicion in the present case.

In LaFrance, we left open the definition of "reasonable suspicion" for searches of probationers.  Id. at 793.  In so doing, we suggested that an appropriate standard may be that set out in Terry v. Ohio, 392 U.S. 1 (1968), and its progeny.  LaFrance, supra.  We now apply the reasonable suspicion standard associated with stop and frisks to warrantless searches of a parolee's home.[8]

---

warrantless searches, as parole officers may only "make such investigations as may be necessary."  G. L. c. 27, § 5.

[8] In considering the legality of such searches, we look to "whether the intrusiveness of the government's conduct is proportional to the degree of suspicion that prompted it. . . . [W]e must balance the need to . . . conduct the search against the intrusion on the defendant" (citations omitted).  Commonwealth v. Torres, 433 Mass. 669, 672 (2001).  In justifying the search, we require that the officer's actions be "based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience," Commonwealth v. Wilson, 441 Mass. 390, 394 (2004), indicating that a search of a parolee's home, pursuant to a parole condition, would render evidence that the parolee has violated, or is about to violate, a condition of parole.

"[I]n making that assessment it is imperative that the facts be judged against an objective standard," such that "the facts available to the officer at the moment of the seizure or the search" would, taken as a whole, "warrant a man of reasonable caution in the belief that the action taken was appropriate" (quotations omitted).  Terry v. Ohio, 392 U.S. 1, 21-22 (1968).  See Commonwealth v. Gomes, 453 Mass. 506, 511

The motion judge found that, at the time of the search, Jackson had reasonable suspicion that the defendant was dealing in illegal drugs, in violation of the conditions of his parole, and that evidence of such violation would be found in his residence.[9]  We agree.

In reaching this conclusion, we note that Jackson's "need to . . . conduct the search" was high, as the defendant was on parole for a violent crime.  Commonwealth v. Torres, 433 Mass. 669, 672 (2001).  The defendant's parole was subject to several conditions, including that he "not illegally use, sell, possess, distribute, or be in the presence of drugs."  He was also subject to the condition that his parole officer supervise him for drugs.  Therefore, when Jackson received an anonymous tip that the defendant was dealing in drugs, it was incumbent on him to investigate that tip for evidence of corroboration.  In so doing, Jackson reviewed the defendant's recent GPS data, which showed that, several days before, he had made a trip from New Bedford with a brief stop in Boston.  The stop was made in what

_____

(2009).  "Seemingly innocent activities taken together can give rise to reasonable suspicion" (quotation omitted), but "reasonable suspicion may not be based merely on good faith or a hunch."  Id.

[9] The defendant did not challenge this ruling on appeal.

the Boston parole office referred to as a "high crime area."[10]
After returning to his home in New Bedford from that trip, the
GPS data revealed that the defendant made several short stops in
New Bedford over the following two days, consistent with the
delivery of drugs to others.  Based on his experience on the
gang unit task force, which often dealt with narcotics-related
investigations, Jackson became increasingly concerned that the
defendant was dealing in drugs.

Jackson later checked the current GPS data on the defendant
and learned that he had just made another trip to Boston,
stopping off briefly (this time for six or seven minutes), again
in a high crime area, and was heading back towards New Bedford.
Acting on information from Jackson and on observation that the
automobile in which the defendant was traveling was exceeding
the speed limit, the police stopped it.

During the stop, the driver of the automobile, the
defendant's girl friend, was "extremely nervous,"[11] and the

_____

[10] "Although an individual's presence in a high crime area
alone will not establish a reasonable suspicion, . . . it may
nevertheless be a factor leading to a proper inference that the
individual is engaged in criminal activity" (citations omitted).
Commonwealth v. Thompson, 427 Mass. 729, 734, cert. denied, 525
U.S. 1008 (1998).

[11] See Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007)
("Although nervous or furtive movements do not supply reasonable
suspicion when considered in isolation, they are properly
considered together with other details to find reasonable
suspicion").

officers observed the defendant in possession of marijuana.  The defendant lied about where he had just been,[12] and the officers then found two concealed bags of cocaine on the defendant's girl friend (with whom the defendant shared a bedroom in their joint residence in New Bedford).  This activity established that the defendant had violated the conditions of his parole regarding possessing and being in the presence of drugs, and provided further corroboration for the anonymous tip that the defendant was dealing in drugs.[13]

Based on the tip, the evidence of the defendant's conduct consistent with that tip, and in light of Jackson's experience, both with narcotics and with other parolees, it was reasonable for him to suspect that a search of the defendant's home would produce further evidence of drug-related parole violations, including illegal possession or distribution.  See 2 W.R.

---

[12] See Commonwealth v. Stewart, 469 Mass. 257, 264 (2014) (defendant's false denial of having participated in suspicious activity of which police were already aware "strengthens the suspicion that the defendant had participated in a drug transaction").

[13] "Where police conduct an investigatory stop based on information gleaned from an anonymous tip, courts assess the sufficiency of the information in terms of the reliability of the informant and his or her basis of knowledge." Commonwealth v. Walker, 443 Mass. 867, 872, cert. denied, 546 U.S. 1021 (2005).  Where the required standard is reasonable suspicion rather than probable cause, "a less rigorous showing in each of these areas is permissible." Commonwealth v. Mubdi, 456 Mass. 385, 396 (2010), quoting Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).  "Independent police corroboration may make up for deficiencies in one or both of these factors." Lyons, supra.

LaFave, Search and Seizure § 3.7(d), at 530-531 (5th ed. 2012) ("it is commonly held . . . that drug dealers ordinarily keep their supply, records and monetary profits at home").[14] Among other things, the defendant's conduct over the course of multiple days after his trip to Boston suggested that a stash was stored somewhere overnight, and it was reasonable to conclude that instrumentalities, whether they be drugs, records, or profits from drug sales, would be located where the defendant lived.[15,16]

---

[14] See also United States v. Sanchez, 555 F.3d 910, 914 (10th Cir.), cert denied, 556 U.S. 1145 (2009) (it is "merely common sense that a drug supplier will keep evidence of his crimes at his home"); United States v. Spencer, 530 F.3d 1003, 1007 (D.C. Cir.), cert. denied, 555 U.S. 1017 (2008) ("Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade . . . in secure locations," and "[f]or the vast majority of drug dealers, the most convenient location to secure items is the home"); United States v. Grossman, 400 F.3d 212, 218 (4th Cir. 2005) (search made pursuant to warrant was upheld because "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key").

[15] Parolees "have . . . an incentive to conceal their criminal activities  . . . because [they] are aware that they may be subject to supervision and face revocation" of parole. Samson v. California, 547 U.S. 843, 849 (2006).

[16] Moreover, under the assumption that the defendant was dealing in drugs, it was also reasonable to assume that the drugs, cash, and any records from drug distribution not found during a search of the defendant's automobile would be located at his home.  See Commonwealth v. O'Day, 440 Mass. 296, 302 (2003) ("nexus may be found in the type of crime, . . . the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide the drugs he sells" [quotation omitted]).  See also United States v.

We need not conclude that the tip, the GPS findings, the defendant's behavior, and the violation of the parole conditions concerning drugs would have been sufficient to establish probable cause in support of a search warrant for his home. See, e.g., Commonwealth v. Pina, 453 Mass. 438, 441 (2009), quoting Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983) ("Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search a person's residence"); Commonwealth v. O'Day, 440 Mass. 296, 300 (2003) ("To establish probable cause . . . the affidavit must contain enough information for the issuing magistrate to determine that the items sought . . . may reasonably be expected to be located in the place to be searched" [quotation omitted]). Rather, in light of the defendant's diminished expectation of privacy, and the lesser standard of reasonable suspicion, the facts in this case, including seemingly innocent activities, taken together were sufficient to justify a search of the defendant's home for

---

Lewis, 71 F.3d 358, 362-363 (10th Cir. 1995) (police, armed with information deemed to be reliable that parolee was involved in drug activity, had reasonable suspicion on that basis alone to "justify[] the parole agents' warrantless search of his residence"); 2 W.R. LaFave, Search and Seizure § 3.7(d), at 528-530 (5th ed. 2004) ("[T]here need not be definite proof that the seller keeps his supply at his residence . . . . [I]t will suffice if there are some additional facts . . . which would support the inference that the supply is probably located there").

evidence of a parole violation.  See Commonwealth v. Gomes, 453 Mass. 506, 511 (2009).

3.  Conclusion.  Our decision today effectively balances the Commonwealth's significant interest in supervising parolees -- and, at the same time, protecting the Commonwealth's citizens from the risks of recidivism -- with the parolees' diminished expectations of privacy.  Individualized suspicion, jettisoned by the Supreme Court in an analogous scenario, remains, under art. 14, an important safeguard against unfettered police authority.  However, because the need to supervise parolees weighs heavily against that backdrop, reasonable suspicion that there is evidence in the parolee's home that the parolee has violated, or is about to violate, a condition of his or her parole, is sufficient to justify a search of the parolee's home without the need for a warrant.

Because the defendant was a parolee when the officers searched his home, and because the search was conducted under reasonable suspicion that the defendant had violated a condition of his parole by dealing drugs, the drugs, digital scale, and gun lock seized during the search should not have been suppressed.

So ordered.

HINES, J. (dissenting, with whom Duffly, J., joins).  I agree with the court's ruling that a parole officer may conduct a warrantless search of a parolee's home based on reasonable suspicion that the search will reveal evidence that the parolee has, or is about to, violate a condition of his or her parole.  I do not agree, however, with the court's application of that principle to this case.  Even assuming the corroboration of the anonymous tip that the defendant was selling drugs in New Bedford, the totality of the information known to the police at the time of the search does not establish reasonable suspicion that evidence of the defendant's drug dealing activities would be found in his home.  For this reason, I respectfully dissent.

The test for reasonable suspicion to conduct a warrantless search of a parolee's home is the same as that articulated in Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, see Commonwealth v. Silva, 366 Mass. 402, 406 (1974).  Ante at [13].  It requires that the officer's actions be based on "specific and articulable facts and the specific reasonable inferences" that the search would reveal evidence that the parolee has, or is about to, violate a condition of parole.  Silva, supra.  The court's analysis leans heavily on the tip that the defendant violated the conditions of parole by selling illegal drugs and, based in large part on that information, finds the required nexus to the defendant's home.  The analysis is flawed insofar

as it is premised on an unacceptably conclusory view of the facts known to the parole officer at the time of the search. The substance of the court's reasoning is that "[b]ased on the tip, the evidence of the defendant's conduct consistent with that tip, and in light of [the parole officer's] experience, both with narcotics and with other parolees, it was reasonable for him to suspect that a search of the defendant's home would produce further evidence of drug-related violations, including illegal possession or distribution." Ante at [17]. The required nexus between the defendant's criminal activity and his home demands more specificity than is supplied by the bare-bones "tip" and the "evidence of the defendant's conduct consistent with that tip" on which the court relies. Id. At best, the information relied on by the court to find a nexus between the defendant's illegal activity and his home established only that he was suspected of a crime and that he lived at the residence where the search was conducted. "Information establishing that a person is guilty of a crime does not necessarily constitute probable cause [or in this case reasonable suspicion] to search the person's residence." Commonwealth v. Pina, 453 Mass. 438, 441 (2009), quoting Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Similarly, reasonable suspicion that evidence of the defendant's illegal drug activity would be found in the defendant's home "is not established by

the fact that the defendant lives there."  Pina, supra.

Although our cases addressing the nexus between the suspected criminal activity and the place of the search arise in the context of probable cause for the issuance of a search warrant, the analytical framework underlying those cases is instructive.  In that context, the issue is whether the warrant establishes "a sufficient nexus between the defendant's drug-selling activity and his residence to establish probable cause to search the residence."  Id., quoting Commonwealth v. O'Day, 440 Mass. 296, 304 (2003).  Applying that framework to the warrantless search of a parolee's home, the issue is the same: whether there is a sufficient nexus between the criminal activity and the defendant's home.  The test, however, is the less rigorous standard of reasonable suspicion rather than probable cause.

As we recently observed, "[n]o bright-line rule can establish whether there is a nexus between suspected drug dealing and a defendant's home."  Commonwealth v. Escalera, 462 Mass. 636, 643 (2012).  Nonetheless, our cases provide sufficient guidance to warrant the conclusion that the nexus was lacking in this case.  We have found a sufficient nexus in cases involving observations by police of a suspect leaving his or her home and proceeding directly to a controlled sale on multiple occasions.  See, e.g., Commonwealth v. Cruz, 430 Mass. 838, 841-

842 (2000) (undercover officer purchased cocaine from defendant in parking lot of defendant's apartment building during six separate controlled sales); Commonwealth v. Monteiro, 80 Mass. App. Ct. 171, 175 (2011) (multiple controlled purchases after defendant observed leaving his home); Commonwealth v. Hardy, 63 Mass. App. Ct. 210, 211-212 (2005) (defendant left from apartment for two controlled purchases).  A nexus may also be shown where the police made a single observation of a suspect departing from his or her home for a drug deal "coupled with other information, such as statements from credible informants." Escalera, supra at 644.  Ultimately, "there need not be definite proof that the seller keeps his supply at his residence" (citation omitted).  Id. at 645.  Rather, it will suffice "if there are some additional facts [that] would support the inference that the supply is probably located there" (citation omitted).  Id.

Accepting for the sake of argument the reliability of the anonymous tip that the defendant was selling illegal drugs in New Bedford,[1] nothing in the information available to the parole

---

[1] I am not persuaded that the anonymous tip was reliable inasmuch as the additional information relative to the defendant's movements fell short in corroborating the claim that he was selling drugs in New Bedford.  Although the parole officer was able to track the defendant's movements, there was no testimony detailing the defendant's specific location.  Nor does the record contain evidence that the defendant was observed engaging in conduct consistent with drug activity.

officer prior to the search connected that activity to the defendant's home.  When questioned about the details of the tip at the motion to suppress hearing, the parole officer responded unequivocally that the anonymous tipster provided no information other than "he [the defendant] was dealing drugs.  That's all." Thus, the tip contained no information from which the parole officer reasonably could infer that this particular illegal activity was occurring at the defendant's home.

The other available information concerning the defendant's movements, on which the court relies, adds nothing to the picture of how the defendant conducted his business and, more specifically, whether the defendant's home was used in the operation of the enterprise.  The parole officer was aware that the defendant had made two trips to Boston, staying for only a brief time and then returning to New Bedford.  On the days following the return from Boston, the defendant moved about New Bedford, suggesting that he might have been selling illegal drugs.  Without more information, however, it is simply not possible to draw any inferences regarding the location of the defendant's supply or the place where the sales occurred.  That the defendant was in the company of a person who had drugs on her person and that the defendant was found in possession of a "blunt" when he was stopped by the police, of course, is evidence of a parole violation.  It is not suggested, however,

that any such violation was the predicate for the search of the defendant's home.  Unquestionably, the search was related to the drug activity and it must be validated on that basis alone.

I recognize that the "facts and inferences underlying the officer's suspicion must be viewed as a whole when assessing the reasonableness of his acts."  Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981).  At the same time, a mere hunch is insufficient.  Commonwealth v. Gomes, 453 Mass. 506, 511 (2009), citing Commonwealth v. Grandison, 433 Mass. 135, 139 (2001).  In my view, all of the information, taken together, amounted to no more than a mere hunch that evidence of drug activity would be found in the defendant's home.  To cross the mere hunch threshold, our cases, as discussed above, have attached relevance and significance to facts simply not present here.  In the complete absence of specific articulable facts establishing a nexus between the defendant's drug activity and his home, the search cannot be justified.  Therefore, I respectfully dissent.