# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MARY DOE, JOHN DOE NO. 1, and JOHN DOE NO. 2, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 10983-VCMR |
| ROBERT M. COUPE, solely in his official capacity as Commissioner of the Delaware Department of Correction, | ) ) ) ) | |
| Defendant. | ) ) | |

## OPINION

Date Submitted: May 3, 2016
Date Decided: August 12, 2016

Richard H. Morse and Ryan Tack-Hooper, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF DELAWARE, Wilmington, Delaware; *Attorneys for Plaintiffs*.

Joseph C. Handlon and Roopa Sabesan, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; *Attorneys for Defendant*.

In this action, three convicted sex offenders challenge the constitutionality of a Delaware statute that requires them to wear GPS monitors on their ankles at all times as a condition of their parole or probation. The plaintiffs are Tier III sex offenders, which means they were convicted of the sex crimes that the Delaware General Assembly has deemed among the most serious. The challenged statute—11 *Del. C.* § 4121(u) ("Section 4121(u)")—mandates GPS monitoring of all Tier III sex offenders granted parole or probation without reference to their individual risks of recidivism. The plaintiffs claim that Section 4121(u) violates the Fourth Amendment to and the *Ex Post Facto* Clause of the United States Constitution, as well as Article I, § 6 of the Delaware Constitution. The defendant—the Commissioner of the Delaware Department of Correction, which administers Delaware's GPS monitoring program—maintains that Section 4121(u) is valid under the United States and Delaware Constitutions.

Both parties have moved for summary judgment. For the reasons stated in this Opinion, I grant the defendant's motion for summary judgment and deny the plaintiffs' motion for summary judgment.

1

## I. BACKGROUND[1]

### A. Parties

Plaintiffs John Doe No. 1, John Doe No. 2, and Mary Doe ("Plaintiffs") are citizens and residents of Delaware who previously were convicted of and incarcerated for sex crimes.[2] Defendant Robert M. Coupe is the Commissioner of the Delaware Department of Correction.

### B. Facts

#### 1. Plaintiffs are convicted of and incarcerated for sex crimes

In 1979, John Doe No. 1 was convicted of raping a forty-seven year old woman. He served thirty years in the Sussex Correctional Institution and was released on parole in 2009. In 1992, Mary Doe was convicted of being an accomplice to the rape, sodomy, and robbery of a twenty-one year old woman in New York. She was incarcerated in New York from 1991 until 2010, when she was released on parole. In 2001, John Doe No. 2 pled guilty to second degree

---

[1] The facts are drawn from the parties' pleadings and the evidence submitted as appendices to the parties' briefs. *See* Ct. Ch. R. 56(c). Of particular note are the depositions of John Sebastian, *see* App. to Pls.' Opening Br., at P019-53 ("Sebastian Dep."), and Chrysanti S. Leon, Ph.D., J.D., *see* App. to Pls.' Opening Br., at P076-110 ("Leon Dep."). Sebastian is the Director of the Department of Correction's Probation and Parole section. Leon is Plaintiffs' expert witness and a tenured professor in the University of Delaware Department of Sociology and Criminal Justice, with secondary appointments in the Departments of Women and Gender Studies and Legal Studies.

[2] On April 30, 2015, the Court granted Plaintiffs' Motion for Leave to File and Proceed using pseudonyms. *See* Docket Item ("D.I.") No. 2.

2

unlawful sexual intercourse. He was released from prison in July 2009 and was placed on probation.

Despite their heinous crimes, John Doe No. 1 and Mary Doe each have exhibited signs of successful rehabilitation. According to a deputy warden at the Sussex Correctional Institution, John Doe No. 1 "made exceptional personal change and growth during his incarceration at SCI. He has left behind the person that he was."[3] That same deputy warden also stated that John Doe No. 1 "has moved on to become the type of man who continually strives to improve himself and his community, exactly the kind of person every community hopes to count among its members."[4] Further, the Deputy Attorney General who prosecuted John Doe No. 1—who now serves as a Delaware Superior Court Judge—wrote that before meeting with John Doe No. 1, "I had my doubts as to the rehabilitative prospects of a once violant [sic] offender. Now, I sincerely believe that [John Doe No. 1] represents a person who is totally, firmly and truly rehabilitated. He is, in brief, a changed person."[5]

While in prison, Mary Doe earned a GED, an Associate Degree, and a Bachelor's Degree in sociology. She will receive a Master's Degree in psychology

---

[3]     Compl. ¶ 28.

[4]     *Id.*

[5]     *Id.* ¶ 29.

later this year. Mary Doe lives with her husband and three children and is the Director of the Mental Health Court Peer Team, assigned to Superior Court Mental Health Court in Wilmington. According to James Lafferty, the Executive Director of the Mental Health Association in Delaware, Mary Doe is "a model of a person who has not only succeeded in recovery but in rehabilitation."[6]

### 2. Plaintiffs are Tier III sex offenders

"In Delaware, after an individual is convicted of or adjudicated delinquent for any offense enumerated in the statute, the trial court must conduct a hearing at which the trial judge is required to designate the defendant as a sex offender."[7] The convicted sex offenders then are assigned to one of three Risk Assessment Tiers of the sex offender registry—under 11 *Del. C.* § 4121—depending on the severity of their crime.[8]

"The sentencing court has no discretion in" assigning a convicted sex offender to a Risk Assessment Tier.[9] Instead, "[t]he statute [11 *Del. C.* § 4121] clearly delineates the tier to which a sex offender is to be assigned based on the particular offense for which that individual was convicted and mandates

---

[6]    App. to Pls.' Opening Br., at P157.

[7]    *Helman v. State*, 784 A.2d 1058, 1066 (Del. 2001) (footnotes omitted) (citing 11 *Del. C.* § 4121(c)).

[8]    *See* 11 *Del. C.* § 4121(c)-(d).

[9]    *Helman*, 784 A.2d at 1066.

assignment to that Tier level without any regard to the facts or circumstances of the particular case."[10]  Tier III is the most severe of the three Risk Assessment Tiers and includes, for example, convictions for rape in the first degree, rape in the second degree, unlawful sexual contact in the first degree, and sexual abuse of a child under the age of 13.[11]  At the time they filed their verified complaint (the "Complaint"), Plaintiffs were assigned to Risk Assessment Tier III.

### 3. As Tier III sex offenders, Plaintiffs are required to wear GPS monitors as a condition of parole or probation

Coupe, as Commissioner of the Department of Correction, is responsible for the oversight, operation, and administration of Delaware's correctional system, including the Department's Probation and Parole ("P&P") section.  P&P administers Section 4121(u), which requires that "any Tier III sex offender being monitored at Level IV, III, II or I, shall as a condition of their probation, wear a GPS locator ankle bracelet paid for by the probationer."[12]  Thus, as Tier III sex offenders, Plaintiffs were subject to Section 4121(u) at the time this action was filed and, consequently, were required to wear GPS monitors on their ankles.[13]

---

[10]  *Id.*

[11]  11 *Del. C.* § 4121(d)(1).

[12]  *Id.* § 4121(u).

[13]  After Plaintiffs filed their Complaint, John Doe No. 2 was reincarcerated for violating the terms of his probation.  In addition, the New York Board of Parole

Although P&P supervises Tier III sex offenders in an individualized manner,[14] it has no discretion in determining whether an individual parolee or probationer should be subject to GPS monitoring. As Sebastian testified, P&P administers GPS monitoring for all Tier III sex offenders "because it's required to be done and the legislature has determined that it's appropriate by making that law."[15] Sebastian further explained that he has "never given great thought to . . . whether it makes sense or doesn't make sense or whether we should or shouldn't [monitor all Tier III sex offenders using GPS]. It's a requirement, therefore, we do it."[16]

### 4. Plaintiffs complain that the GPS monitors cause them substantial hardship

John Doe No. 1 described the embarrassment that the GPS monitor causes him and the lengths to which he goes to avoid having to talk with other people about it. He "wear[s] clothes that will cover the monitor as best [he] can whenever [he is] outside [his] home in order to reduce the frequency with which people see

---

discharged Mary Doe from her parole, and she was dismissed from this action. *See* Stipulation of Dismissal of Mary Doe, D.I. No. 61. As a result, only John Doe No. 1 remains subject to GPS monitoring under Section 4121(u).

[14] Leon Dep. 27:11-15, 34:14-35:23.

[15] Sebastian Dep. 109:17-19.

[16] *Id.* at 110:18-21.

the GPS monitor and question why [he is] wearing it."[17] The GPS monitor also "caused [his] leg to become infected because it was too tightly affixed."[18] Although the infection went away after P&P loosened the GPS monitor, P&P still had to move the monitor to John Doe No.1's other leg "because it was injuring the first leg."[19] Because John Doe No. 1 has to pay "$4.65 per day for the GPS monitor," he now has "an outstanding bill in excess of $11,000."[20]

John Doe No. 2 also "incurred a debt of more than $11,000 for the monitor."[21] Further, John Doe No. 2 "was employed by a temporary employment company performing cleaning services inside a power plant."[22] John Doe No. 2 "was frequently instructed by [his] probation officer . . . to step outside the plant so that the GPS satellite could pick up the signal from the monitor."[23] Because of the

---

[17] App. to Pls.' Opening Br., at P135.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* at P149.

[22] *Id.*

[23] *Id.*

disruption that his frequent trips outside of the power plant caused, John Doe No. 2 "lost that work, and became unemployed."[24]

Finally, Mary Doe complained that the GPS monitor on her ankle "rubbed [her] skin to the point of soreness" and "caused [her] ankle to bruise."[25] Mary Doe "wore slacks all of the time to work, church and whenever else [she] was out in public" because she "did not want to deal with the public questioning that results from having the monitor visible on [her] ankle."[26] The GPS monitor also negatively impacted Mary Doe's time with her family. Because Mary Doe was too embarrassed to wear bathing suits, she was "prevented . . . from swimming with [her family] on family vacations."[27] In addition to the physical pain and embarrassment that the GPS monitor caused Mary Doe, she also "had to carry the charger for the GPS monitor wherever [she] went in order to keep it charged."[28]

## C. Procedural History

On May 4, 2015, Plaintiffs filed their Complaint against Coupe, solely in his official capacity as Commissioner of the Department of Correction. The

---

[24] *Id.*

[25] *Id.* at P152-53.

[26] *Id.* at P153.

[27] *Id.*

[28] *Id.*

8

Complaint seeks a declaration that Section 4121(u) violates the United States and Delaware Constitutions and an injunction ordering P&P to allow Plaintiffs to remove their GPS monitors. On June 8, 2015, Coupe filed a motion to dismiss the Complaint under Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction. Vice Chancellor Parsons issued a letter opinion on July 14, 2015 denying Coupe's motion to dismiss on the grounds that "this Court does have subject matter jurisdiction over Plaintiffs' claims, because those claims truly seek equitable relief and it is not clear that Plaintiffs could obtain an adequate remedy at law."[29]

On December 22, 2015, Coupe stipulated that he would not "argue that anything particular or unique to Plaintiffs or anything in their histories (other than their convictions) justifies that they be monitored" or "that particular circumstances of the Plaintiffs (other than criminal convictions and concomitant tiering of Plaintiffs) requires that they be monitored."[30] "After discovery was completed, counsel notified the Court that they believed there was no dispute of material fact and requested that the case go forward on cross motions [for summary

---

[29] *Doe v. Coupe*, 2015 WL 4239484, at *2 (Del. Ch. July 14, 2015).

[30] Stipulation & Proposed Order Governing Further Proceedings in this Action, D.I. No. 55.

9

judgment]."[31]  The parties filed and briefed their cross motions for summary judgment and, on May 3, 2016, I heard oral argument on those cross motions. This Opinion contains my rulings on the parties' cross motions for summary judgment.

## D.  Parties' Contentions

Plaintiffs advance three separate arguments regarding Section 4121(u)'s alleged invalidity.  Plaintiffs claim that they are entitled to summary judgment under any of those three arguments.  First, Plaintiffs contend that Section 4121(u) violates the Fourth Amendment to the United States Constitution (the "Fourth Amendment").  As an initial matter, Plaintiffs highlight the United States Supreme Court decision *Grady v. North Carolina*, which confirms that GPS monitoring of a parolee or probationer "effects a Fourth Amendment search."[32]  Plaintiffs then point out that a search's constitutionality under the Fourth Amendment is measured by its reasonableness; if a search is unreasonable, then it is unconstitutional. According to Plaintiffs, Section 4121(u) is unreasonable because its GPS monitoring requirement significantly intrudes upon Plaintiffs' privacy, and that

---

[31]     Pls.' Opening Br. 2.

[32]     135 S.Ct. 1368, 1371 (2015).

intrusion is not outweighed by Section 4121(u)'s efficacy in satisfying the government's purported interest in avoiding recidivism by Tier III sex offenders.[33]

Second, Plaintiffs argue that Section 4121(u) violates Article I, § 6 of the Delaware Constitution ("Article I, § 6"). Plaintiffs read relevant Delaware Supreme Court precedent as indicating that Article I, § 6 "provides broader search and seizure protections than the Fourth Amendment."[34] In particular, Plaintiffs highlight cases that require an objective and particularized basis for suspecting wrongdoing—*i.e.*, reasonable suspicion—before performing a warrantless search of a parolee or probationer.[35] As such, Plaintiffs contend that because Section 4121(u) mandates GPS monitoring for all Tier III sex offenders without reference to any individualized assessment, it violates Article I, § 6.

Third, and finally, Plaintiffs assert that Section 4121(u) violates the United States Constitution's *Ex Post Facto* Clause (the "*Ex Post Facto* Clause"). Plaintiffs acknowledge that the Delaware Supreme Court, in *Hassett v. State*,

---

[33]     *See, e.g.,* Pls.' Answering Br. 10 ("The absence of any governmental interest in focusing on people who do not pose a risk instead on those who do, together with the intrusiveness of the GPS searches, renders §4121(u) invalid under the Fourth Amendment.").

[34]     *Id.* at 20.

[35]     *Id.* at 20-27 (citing *Shepeard v. State*, 133 A.3d 204, 2016 WL 690544, at *2 (Del. Feb. 18, 2016) (TABLE); *Murray v. State*, 45 A.3d 670, 678 (Del. 2012); *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008); *Donald v. State*, 903 A.2d 315, 319 (Del. 2006)).

11

already has held that "the retroactive application of Section 4121(u) requiring registered Tier III sex offenders to wear GPS monitoring bracelets while on supervision at Levels IV–I does not implicate the ex post facto clause because the statute is intended for public safety and is not punitive in nature."[36]  Plaintiffs, therefore, "[r]ecogniz[e] that [*Hassett*] binds this Court" and "address the [*Ex Post Facto* Clause] question in [their] brief[s] in order to preserve the issue for appeal."[37]  "Plaintiffs also request that this Court address the Ex Post Facto claim, so that the [Delaware] Supreme Court will have the benefit of this Court's analysis if an appeal is necessary."[38]

Coupe agrees that GPS monitoring constitutes a "search" under the United States and Delaware Constitutions.  Coupe disagrees, however, that Section 4121(u) is violative of the Fourth Amendment, Article I, § 6, or the *Ex Post Facto* Clause.  As to the Fourth Amendment, Coupe argues that GPS monitoring under Section 4121(u) is reasonable because parolees and probationers have diminished expectations of privacy, and the Delaware government's interest in avoiding recidivism by Tier III sex offenders outweighs those diminished privacy expectations.  As to Article I, § 6, Coupe disputes Plaintiffs' contention that the

---

[36]    12 A.3d 1154, 2011 WL 446561, at *1 (Del. Feb. 8, 2011) (TABLE).

[37]    Pls.' Opening Br. 28.

[38]    Pls.' Answering Br. 23.

12

Delaware Constitution imposes a "heightened standard of reasonableness" for searches of parolees and probationers.[39]  Coupe maintains that individualized findings as to each Tier III sex offender are unnecessary and contends that if a search is reasonable under the Fourth Amendment, then it passes muster under Article I, § 6 as well.  And, as to the *Ex Post Facto* Clause, Coupe simply notes that "this Court is bound by the Delaware Supreme Court's decision in *Hassett v. State*."[40]  Thus, Coupe claims that he is entitled to summary judgment.

## II.  ANALYSIS

### A.  Standard of Review

"Summary judgment is granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[41]  On a motion for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party."[42]  Under Court of Chancery Rule 56(h),

---

[39]  Def.'s Answering Br. 24.

[40]  *Id.* at 43 (citing 12 A.3d 1154, 2011 WL 446561).

[41]  *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[42]  *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

13

> [w]here the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[43]

In such situations, "the usual standard of drawing inferences in favor of the nonmoving party does not apply."[44] Because the parties have not presented any disputes of material fact, I treat their cross motions as a stipulation for decision on the merits on the record submitted.[45]

### B.     Section 4121(u) Does Not Violate the Fourth Amendment

#### 1.     Legal standard for reasonableness under the Fourth Amendment

GPS monitoring of Plaintiffs pursuant to Section 4121(u) is a Fourth Amendment search.[46] "The Fourth Amendment prohibits only *unreasonable* searches."[47] Although "a search ordinarily must be based on individualized suspicion of wrongdoing"[48] and law enforcement officials generally

---

[43]     Ct. Ch. R. 56(h).

[44]     *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 18 (Del. Ch. 2005) (citing Ct. Ch. R. 56(h)), *aff'd*, 903 A.2d 728 (Del. 2006).

[45]     *Id.*

[46]     *Grady*, 135 S.Ct. at 1370.

[47]     *Id.* at 1371.

[48]     *Chandler v. Miller*, 520 U.S. 305, 313 (1997).

14

are required to show "probable cause" before obtaining a judicial warrant to search for evidence of criminal wrongdoing, "[a] search unsupported by probable cause can be constitutional . . . 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"[49] In *Griffin v. Wisconsin*, the United States Supreme Court held that '[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."[50] "When the subjects of searches are probationers and parolees, . . . the Fourth Amendment suppl[ies] a relaxed standard for reasonableness because of the special needs of parole and probation supervision."[51]

In *Vernonia School District 47J v. Acton*,[52] the United States Supreme Court articulated the three factor "special needs" test that applies to suspicionless searches under the Fourth Amendment. "The first factor to be considered is the

---

[49]  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).

[50]  483 U.S. at 873-74.

[51]  Pls.' Opening Br. 21; *accord* Def.'s Answering Br. 13; *see also Donald*, 903 A.2d at 318-19.

[52]  515 U.S. 646.

nature of the privacy interest upon which the search here at issue intrudes."[53] The second factor is "the character of the intrusion that is complained of."[54] The third factor is "the nature and immediacy of the governmental concern at issue [in the case], and the efficacy of [the disputed] means for meeting it."[55] Evaluating those three factors requires "a context-specific inquiry, examining closely the competing private and public interests advanced by the parties,"[56] and a court must consider "the totality of the circumstances."[57]

Finally, when making a facial challenge to a statute under the Fourth Amendment, as Plaintiffs do here,[58] "a plaintiff must establish that a 'law is unconstitutional in all of its applications.'"[59] Such a challenge, therefore, is "the most difficult challenge to mount successfully."[60]

---

[53] *Id.* at 654.

[54] *Id.* at 658.

[55] *Id.* at 660.

[56] *Chandler*, 520 U.S. at 313.

[57] *Grady*, 135 S.Ct. at 1371.

[58] Oral Arg. Tr. 19 (Plaintiffs' counsel agreeing that Plaintiffs' challenge to Section 4121(u) is a facial challenge).

[59] *City of Los Angeles v. Patel*, 135 S.Ct. 2443, 2451 (2015) (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

[60] *U.S. v. Salerno*, 481 U.S. 739, 745 (1987).

16

## 2. Section 4121(u) is reasonable under the Fourth Amendment

I address each of the three factors of the *Vernonia* special needs test in turn to evaluate whether Section 4121(u) is reasonable under the Fourth Amendment. Plaintiffs' "status as [parolees and probationers] subject to a search condition informs" each of the three factors of the "special needs" test of Section 4121(u)'s reasonableness.[61]

### a. The nature of Plaintiffs' privacy interest

As to the first *Vernonia* factor, "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"[62] Probationers who agree to warrantless searches as a condition of their probation have "significantly diminished . . . reasonable expectation[s] of privacy."[63] Further, "parolees have [even] fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."[64] In *U.S. v. Knights* and *Samson v. California*, probationers and parolees accepted warrantless and suspicionless search requirements as conditions

---

[61]  *U.S. v. Knights*, 534 U.S. 112, 119 (2001).

[62]  *Vernonia*, 515 U.S. at 654.

[63]  *Knights*, 534 U.S. at 119-20.

[64]  *Samson v. California*, 547 U.S. 843, 850 (2006).

17

of their probation or parole.[65]  In those cases, the Court found it "salient" that the probationers and parolees were "unambiguously aware" of the warrantless and suspicionless search requirements as a condition of their probation or parole.[66]  The Court concluded, therefore, that those probationers and parolees "did not have an expectation of privacy that society would recognize as legitimate."[67]

Similarly, Plaintiffs voluntarily accepted Section 4121(u)'s GPS monitoring requirement as a condition of their probation or parole to avoid further prison time. And, Plaintiffs cannot seriously contend that they were unaware that their locations were being tracked because the GPS monitors were physically attached to their ankles.  Thus, "[e]xamining the totality of the circumstances pertaining to [Plaintiffs'] status as [parolees and probationers], 'an established variation on imprisonment,' . . . [Plaintiffs] [do] not have an expectation of privacy that society would recognize as legitimate."[68]

### b.  The character of Section 4121(u)'s privacy intrusion

As to the second *Vernonia* factor, I recognize that GPS monitoring necessarily intrudes upon an individual's privacy.  Plaintiffs describe the physical

---

[65]  *See Samson*, 547 U.S. at 852; *Knights*, 534 U.S. at 119.

[66]  *Samson*, 547 U.S. at 852; *Knights*, 534 U.S. at 119.

[67]  *Samson*, 547 U.S. at 852; *accord Knights*, 534 U.S. at 119-20.

[68]  *Samson*, 547 U.S. 852.

18

burdens, the embarrassment and shame, and the occupational inconvenience that they have experienced as a result of wearing the GPS monitors on their ankles. And, in *State v. Holden*, the Superior Court noted the extent to which continuous GPS monitoring can intrude upon an individual's privacy:

> The whole of a person's progress through the world, into both public and private spatial spheres, can be charted and recorded over lengthy periods possibl[y] limited only by the need to change the transmitting unit's batteries. Disclosed in the data retrieved from the transmitting unit, nearly instantaneously with the press of a button on the highly portable receiving unit, will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue, or church, the gay bar and on and on. What the technology yields and records with breathtaking quality and quantity is a highly detailed profile, not simply of where we go, but by easy inference, of our associations-political, religious, amicable and amorous, to name a few-and of the pattern of our professional and advocational pursuits.[69]

That said, however, while I do recognize that Section 4121(u)'s GPS monitoring requirement limits Plaintiffs' privacy, I also recognize that, undoubtedly, "[h]aving

---

[69]    54 A.3d 1123, 1130 (Del. Super. 2010) (quoting *People v. Weaver*, 909 N.E.2d 1195, 1199-1200 (N.Y. 2009)).

19

to wear a GPS anklet monitor is less restrictive, and less invasive of privacy, than being in jail or prison."[70]

Further, in evaluating the character of a search's intrusion upon an individual's privacy, "[t]he focus must . . . be on the *incremental* effect of the challenged statute on the plaintiff's privacy."[71] P&P does not track Plaintiffs while they are inside their own homes.[72] The GPS monitor is "[w]aterproof to 15 feet,"[73] so Plaintiffs can bathe and swim while it is on their ankles. To the extent that Plaintiffs are embarrassed by or ashamed of their GPS monitors,[74] their status as Tier III sex offenders already requires them to notify the community of their criminal history.[75] Such notification "may include door-to-door appearances, mail, telephone, newspapers or notices to schools and licensed day care facilities within the community, or any combination thereof," and "may also include a photograph of the offender."[76] A Tier III sex offender also must publicly register as a sex

---

[70]     *Belleau v. Wall*, 811 F.3d 929, 932 (7th Cir. 2016).

[71]     *Id.* at 934-35.

[72]     Sebastian Dep. 56:15-24.

[73]     App. to Def.'s Opening Br., at D111.

[74]     Pls.' Opening Br. 14 ("Like a modern day Scarlett Letter, they embarrass the wearer and his or her family. When a pants leg raises, the casual observer can see the device and know that the wearer is being surveilled by the authorities.").

[75]     *See Helman*, 784 A.2d at 1066-67.

offender and is subject to the registration and community notification requirements "for the remainder of his or her life."[77] The incremental imposition into Plaintiffs' privacy caused by Section 4121(u)'s GPS monitoring requirement, therefore, is not unduly burdensome.

### c. The nature and immediacy of Delaware's governmental concern and Section 4121(u)'s efficacy for meeting it

Finally, as to the third *Vernonia* factor, Plaintiffs do not dispute that the Delaware state government has a legitimate interest in avoiding recidivism by sex offenders. Instead, Plaintiffs contend that Section 4121(u)'s mandated GPS monitoring of all Tier III sex offenders—without reference to the actual risk posed by any individual sex offender—is not an efficacious means by which to satisfy that interest.[78] To support that position, Plaintiffs rely heavily on Leon's testimony and expert report. Leon testified that, generally, "sex offenders have a low rate of recidivism compared to other offenders."[79] According to Leon's expert report, "[t]he only peer-reviewed empirical study to date of GPS surveillance of registered

---

[76] 11 *Del. C.* § 4121(a)(1).

[77] *Helman*, 784 A.2d at 1067 (citing 11 *Del. C.* § 4121(f)(1)).

[78] Pls.' Opening Br. 23 ("In this case, the governmental interest in preventing future sex offenses is great, but the efficacy of the monitoring scheme required by § 4121(u) for that purpose is non-existent, as the undisputed facts make clear.").

[79] Leon Dep. 37:14-17.

sex offenders finds that those under GPS surveillance in California were less likely to be charged with failing to register or absconding, but finds no evidence that GPS surveillance reduces any form of sexual offending."[80] Leon's expert report also states that "[n]o research connects failure to register with future sexual offending."[81] As to Section 4121(u)'s blanket GPS monitoring mandate for all Tier III sex offenders, Leon testified that "the tiers do not accurately represent . . . people's risks for new sexual offending, and we can come closer to an accurate prediction of who is going to commit a new sexual offense by using risk assessment tools."[82] In other words, Leon posits that "[t]he best approach to promote public safety is to make sure we focus our resources on the people who present the highest risk" based on individualized assessments as opposed to focusing solely on Risk Assessment Tiers.[83]

Plaintiffs also highlight portions of Sebastian's testimony, in which he conceded that he has "never given great thought to . . . whether" Section 4121(u)'s GPS monitoring requirement for all Tier III sex offenders "makes sense or doesn't

---

[80] App. to Pls.' Opening Br., at P124 (citing Susan Turner et al., *Does GPS Improve Recidivism among High Risk Sex Offenders? Outcomes for California's GPS Pilot for High Risk Sex Offender Parolees*, 10 Victims & Offenders 1, 6 (2015)).

[81] *Id.* at P125.

[82] Leon Dep. 107:1-11.

[83] *Id.* at 38:1-9.

make sense or whether [P&P] should or shouldn't" be monitoring all Tier III sex offenders.[84] And, Plaintiffs point out that as of January 2014, P&P was monitoring 855 sex offenders. Of those 855 sex offenders, 217 were subject to GPS monitoring and only sixty were designated as "high risk" according to an assessment performed by one of P&P's consultants.[85]

Although Coupe quibbles with certain of Plaintiffs' statistics regarding sex offender recidivism rates,[86] I need not resolve the parties' dispute as to that issue. The facts that sex offenders may recidivate at a lower rate than other criminals and that P&P would reduce overall recidivism more effectively by focusing on higher risk individuals are not dispositive as to whether Section 4121(u)'s GPS monitoring requirement is reasonable. Here, the record indicates that Section 4121(u)'s GPS monitoring requirement has at least some benefits in terms of reducing the rate of or mitigating the harm from recidivism by Tier III sex offenders.[87] Even if sex offenders do recidivate at a lower rate than other

---

[84] Sebastian Dep. 110:18-20.

[85] App. to Pls.' Opening Br., at P60-61; Sebastian Dep. 74:1-20, 91:17, 96:4-97:20.

[86] *See, e.g.*, Def.'s Answering Br. 19 ("The State's interest to reduce this [recidivism] risk is even more critical for sex offenses, which, as research shows, are *four times as likely* to be committed by sex offenders than by other probationers and parolees.").

[87] *See generally Griffin*, 483 U.S. at 882 ("Supervision also provides a crucial means of advancing rehabilitation by allowing a probation agent to intervene at the first

23

criminals, the Delaware General Assembly reasonably may view sex crimes as more detrimental to public safety than other crimes and "could also have concluded that *any* sex offender recidivism is more egregious than recidivism of other crimes."[88]   And, because even the most advanced risk assessment metrics

sign of trouble."); *Belleau*, 811 F.3d at 935 (noting that the purpose of Wisconsin's GPS monitoring program for convicted sex offenders is to "deter future offenses by making the plaintiff aware that he is being monitored and is likely therefore to be apprehended should a sex crime be reported at a time, and a location, at which he is present").   As noted above, Leon testified that an empirical study of California's GPS surveillance of registered sex offenders found no evidence that such surveillance reduced sexual offenses.  *See supra* note 80 and accompanying text.   As Coupe notes, however, one of the sources that Leon cites in her expert report also studied California's GPS surveillance program and concluded that "subjects in the GPS group demonstrate significantly better outcomes for both compliance and recidivism."   STEPHEN V. GIES ET AL., U.S. DEP'T OF JUSTICE, MONITORING HIGH-RISK SEX OFFENDERS WITH GPS TECHNOLOGY: AN EVALUATION OF THE CALIFORNIA SUPERVISION PROGRAM FINAL REPORT vii (2012); *see also Belleau*, 811 F.3d at 936 ("A study of similar GPS monitoring of parolees in California found that they were half as likely as traditional parolees to be arrested for or convicted of a new sex offense." (citing GIES ET AL., *supra*, at 3-11, 3-13)).   Further, as to Delaware's GPS monitoring program under Section 4121(u), Sebastian testified that "it's a means of deterrence that would keep the offenders from committing a new offense if they know someone is watching."   Sebastian Dep. 47:11-16.   Sebastian also described one specific instance in which P&P utilized the GPS monitor to discover that a Tier III sex offender was violating the terms of his parole or probation.  *See* Sebastian Dep. 47:18-48:9 ("There is one case where I'm aware of an offender was located using WIFI in a parking lot and they're prohibited from having a computer device and they were located by the officers.   The offender was located with his zipper down, computer out and reviewing porn.   Sex offender on GPS and they found him using the GPS system. . . . By reviewing the mapping information, monitoring information, they noticed he was going to McDonald's on a routine basis and spending a large portion of time there.   So, they went to do surveillance and see why he was there.").

[88]   Def.'s Answering Br. 21.

have subjective components,[89] the General Assembly validly exercised its legislative discretion in using the severity of a sex offender's crime as a proxy for that individual's future risk to society, even if P&P would more effectively reduce sex offender recidivism by deciding whether to use GPS monitors based on individual risk assessments.[90] "Plaintiffs cite no authority for their assertion that

---

[89] *See* Leon Dep. 123:24-124:6-17 (agreeing that risk assessment scores are subjective and imperfect estimates of an individual's threat to society).

[90] *See Helman*, 784 A.2d at 1068 (acknowledging that acts of the Delaware General Assembly enjoy a "presumption of constitutionality" and that courts reviewing the constitutionality of a statute should defer "to legislative judgment in matters 'fairly debatable'" (quoting *Wilm. Med. Ctr., Inc. v. Bradford*, 382 A.2d 1338, 1342 (Del. 1978)) (citing *New Castle Cty. Council v. State*, 688 A.2d 888, 891 (Del. 1996))). In *Helman v. State*, the Delaware Supreme Court upheld the constitutionality of Delaware's Sex Offender Registration against a challenge by a juvenile sex offender. In so ruling, the Delaware Supreme Court directly addressed the Delaware General Assembly's choice to impose post-conviction requirements on sex offenders based on the severity of their offense:

> The General Assembly enacted the Sex Offender Registration Statute in an effort to protect society from both the adult and the youthful sex offender. We recognize that sexual offenses encompass a range of very different kinds of conduct implying varying degrees of seriousness and that recidivism rates may change significantly depending on the offender's circumstances. The Delaware General Assembly chose to condition application of the statute on the seriousness of the offense committed. Whether application of the statute should be contingent upon the juvenile's age, or whether age is a factor in determining tier assignment is essentially a policy determination best left to the legislature.

*Id.* at 1079. Similarly, deciding whether to impose a post-incarceration GPS monitoring requirement on probationers and parolees based on the severity of their offense—as opposed to based on an individual risk assessment—"is essentially a policy determination best left to the legislature." *Id.*

recidivism can only be reduced through individualized assessments, or that the State is required to use the least intrusive means in accomplishing it."[91] On the contrary, the United States Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."[92] Hence, the threat of Section 4121(u) being overly inclusive—thereby subjecting to GPS monitoring certain Tier III sex offenders who, like John Doe No. 1 and Mary Doe, have exhibited signs of rehabilitation—does not render it unreasonable.

### d.    Balancing *Vernonia*'s three factors

I concluded above that (1) Plaintiffs do not have a legitimate privacy interest that suffices to shield them from GPS monitoring, (2) the incremental infringement on Plaintiffs' privacy imposed by Section 4121(u)'s GPS monitoring requirement is not unduly burdensome, and (3) Section 4121(u) is relatively efficacious in advancing the Delaware government's legitimate interest in reducing sex offender recidivism. Taking all of those conclusions into account, I hold that the Delaware government's legitimate interest and chosen means for advancing that interest—*i.e.*, GPS monitoring under Section 4121(u)—outweigh Plaintiffs' interest in

---

[91]    Def.'s Answering Br. 22.

[92]    *Vernonia*, 515 U.S. at 663 (citing *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 629 n.9 (1989)).

avoiding a relatively slight intrusion into their diminished privacy. Plaintiffs, therefore, have failed to demonstrate that Section 4121(u) "is unconstitutional in all of its applications."[93] Consequently, Coupe is entitled to summary judgment as to Section 4121(u)'s reasonableness under the Fourth Amendment.

### C. Section 4121(u) Does Not Violate Article I, § 6

Having concluded that Section 4121(u) does not violate the Fourth Amendment, I must determine whether Section 4121(u) violates Article I, § 6. The threshold determination that I must make is whether Article I, § 6 provides greater protection against searches than does the Fourth Amendment. If it does not, then my conclusion as to Section 4121(u)'s constitutionality under the Fourth Amendment applies to Article I, § 6 with equal force.

As I noted above, Plaintiffs interpret a series of Delaware Supreme Court decisions as indicating that the Delaware Constitution requires an objective and particularized basis for suspecting wrongdoing—*i.e.*, reasonable suspicion—before performing any warrantless search of a parolee or probationer.[94] This is in contrast to the series of United States Supreme Court decisions that explicitly have found suspicionless searches constitutional under the Fourth Amendment when certain

---

[93]     *Patel*, 135 S.Ct. at 2451.

[94]     *See supra* note 35 and accompanying text.

"special needs" are present.[95]   Upon reviewing those Delaware Supreme Court decisions, I disagree with Plaintiffs' interpretation.

In each of the four cases that Plaintiffs cite, the challenged search was a warrantless, administrative search of a probationer's home or vehicle conducted pursuant to the Delaware Department of Correction's regulations, specifically Probation and Parole Procedure 7.19 ("P&P Procedure 7.19").[96]   P&P Procedure 7.19 requires that a probation officer have "reasonable suspicion" before conducting a search of a probationer's residence.[97]   It makes sense, therefore, that even if a probationer agrees to warrantless, administrative searches under P&P Procedure 7.19 as a condition of probation, those warrantless administrative searches cannot be made without reasonable suspicion because P&P Procedure 7.19 explicitly *requires* such reasonable suspicion.[98]   Hence, although each of the

---

[95]     *See supra* Section II.B.1.

[96]     *See Shepeard*, 133 A.3d 204, 2016 WL 690544, at *1; *Murray*, 45 A.3d at 678; *Sierra*, 958 A.2d at 832-33; *Donald*, 903 A.2d at 318-19.

[97]     *Culver v. State*, 956 A.2d 5, 15 (Del. 2008) ("Without reasonable suspicion determined in compliance with their duties under Procedure 7.19, the unlawfully seized evidence and the gun and Culver's oral statement inextricably linked to the seizure of the gun should have been suppressed.").

[98]     Both *Knights* and *Samson* support this position, as the constitutionality of the warrantless and suspicionless searches at issue in those decisions hinged, in part, on the Court's finding that the plaintiffs had clear notice that their probation and parole were conditioned on such searches. *See Samson*, 547 U.S. at 852 ("[A]s we found 'salient' in *Knights* with respect to the probation search condition, the parole search condition under California law—requiring inmates who opt for

four decisions admittedly do state that "reasonable suspicion" is required for a warrantless search, the contexts in which those statements are made indicate that such a rule is limited to administrative searches of probationers' residences and vehicles pursuant to P&P Procedure 7.19. Plaintiffs fail to offer any basis on which I may extend that rule to the suspicionless searches that Plaintiffs agreed to as a condition of their parole or probation under Section 4121(u).

Further, three of the four cases that Plaintiffs cite do not even mention Article I, § 6. Instead, each of those cases addresses only the Fourth Amendment and P&P Procedure 7.19.[99] The fourth case, *Donald*, only mentions Article I, § 6 in the context of equating the Delaware Constitution's protections against searches to the United States Constitution's.[100] It is unreasonable to infer that the Delaware

---

parole to submit to suspicionless searches by a parole officer or other peace officer 'at any time,'—was 'clearly expressed' to petitioner. He signed an order submitting to the condition and thus was 'unambiguously' aware of it. In *Knights*, we found that acceptance of a clear and unambiguous search condition "significantly diminished Knights' reasonable expectation of privacy." (citations omitted) (quoting *Knights*, 534 U.S. at 119)). Similarly, individuals that agree to warrantless, administrative searches under P&P Procedure 7.19 are on clear notice that their residences can be searched without *probable cause*. They are not on clear notice, however, as to the fact that their residences can be searched without *reasonable suspicion*.

[99]  *See Shepeard*, 133 A.3d 204, 2016 WL 690544, at *2; *Murray*, 45 A.3d at 678; *Sierra*, 958 A.2d at 832-33.

[100]  *Donald*, 903 A.2d at 318 & n.6 ("Both the United States and Delaware constitutions protect ordinary citizens from unreasonable searches and seizures. . . . We previously summarized the protections afforded by the federal and Delaware Constitutions against unreasonable searches in *Scott v. State* . . . .").

29

Supreme Court, through those decisions, intended to broaden the Delaware Constitution's protection against searches beyond the scope of the Fourth Amendment either without even mentioning Article I, § 6 or by equating it directly to the Fourth Amendment.[101] Thus, because Article I, § 6 does not provide broader search protections than the Fourth Amendment and because I concluded that Section 4121(u) does not violate the Fourth Amendment, Coupe is entitled to summary judgment as to Section 4121(u)'s validity under Article I, § 6.

## D.    Section 4121(u) Does Not Violate the *Ex Post Facto* Clause

As I noted above, in *Hassett*, the Delaware Supreme Court held "that the retroactive application of Section 4121(u) requiring registered Tier III sex offenders to wear GPS monitoring bracelets while on supervision at Levels IV–I does not implicate the ex post facto clause because the statute is intended for public safety and is not punitive in nature."[102] Although Plaintiffs point out that "[o]ther courts that have addressed the issue have concluded that GPS monitoring

---

[101]    Indeed, in *Dorsey v. State* and *Jones v. State*, the Delaware Supreme demonstrated that when it intends to expand the Delaware Constitution's protections against searches and seizures beyond the scope of the Fourth Amend, it does so explicitly, with clear references to Article I, § 6. *See Dorsey*, 761 A.2d 807, 814-821 (Del. 2000) (performing a "comprehensive scholarly account of the historical differences in the search and seizure provisions in the Delaware and United States Constitution" to conclude that the Delaware Constitution provides greater protections against searches and seizures in certain situations); *Jones*, 745 A.2d 856, 860-69 (Del. 1999).

[102]    12 A.3d 1154, 2011 WL 446561, at *1.

requirements do implicate the ex post facto clause,"[103] I decline to consider that issue because I am bound by the Delaware Supreme Court's ruling in *Hassett*. Coupe, therefore, is entitled to summary judgment on this issue.

## III. CONCLUSION

For the foregoing reasons, Coupe's motion for summary judgment is granted and Plaintiffs' motion is denied.

**IT IS SO ORDERED**.

---

[103]  Pls.' Opening Br. 28 (citing *Riley v. New Jersey State Parole Bd.*, 98 A.3d 544, 560 (N.J. 2014); *Commonwealth v. Cory*, 911 N.E.2d 187, 197 (Mass. 2009)).